Filed 3/8/24  P. v. Cereda CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>SAMUEL J. CEREDA,<br><br>        Defendant and Appellant. | A164330<br><br>(Napa County<br> Super. Ct. No. 19CR002640) |

Defendant Samuel J. Cereda appeals from a sentence of 690 years to life, imposed after a jury found him guilty of 50 counts of sexual offenses against his stepdaughters, Jane Does One and Two.  On appeal, Cereda asserts that there was insufficient evidence of force or duress supporting 46 of the 48 counts involving Jane Doe One.  He additionally contends that his two convictions with respect to Jane Doe Two must be reversed because they were obtained in violation of the corpus delicti rule.  Cereda also argues that the trial court erred by admitting expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS) at trial.  And he challenges the related jury instruction as unconstitutional.  Next, Cereda claims that his sentence of 690 years to life violates both state and federal constitutional prohibitions against cruel and unusual punishment.  Finally, he maintains that the trial court erred in awarding noneconomic damages to Jane Doe One

1

($750,000), Jane Doe Two ($25,000), and the girls' mother, R.M. ($50,000) without a jury trial and without sufficient proof of psychological harm.  We affirm.

## I.  BACKGROUND

### A.  *The Information*

On February 13, 2020, the Napa County District Attorney filed the operative information in this case, charging Cereda with 50 felony counts of child sexual abuse.  Counts one through forty-eight involved offenses against his stepdaughter, Jane Doe One, and were split into timeframes corresponding to Jane Doe One's grade in school.  Thus, the information alleged that between August 16, 2017 and August 14, 2018 (6th grade) Cereda committed two counts of aggravated sexual assault of a child under 14—rape (Pen. Code,[1] §§ 261, subd. (a)(2) & (6), 269, subd. (a)(1), counts one and three); four counts of aggravated sexual assault of a child under 14—oral copulation (§§ 269, subd. (a)(4), 287, subds. (c)(2)-(3) & (d), counts five, seven, nine, and eleven); and two counts of forcible lewd and lascivious acts on a child under 14 (§ 288, subd. (b)(1), counts thirteen and fourteen).

The information further alleged that between August 15, 2018 and August 13, 2019 (7th grade) Cereda committed two counts of aggravated sexual assault of a child under 14—rape (§§ 261, subd. (a)(2) & (6), 269, subd. (a)(1), counts fifteen and seventeen); four counts of aggravated sexual assault of a child under 14—oral copulation (§§ 269, subd. (a)(4), 287, subds. (c)(2)-(3) & (d), counts nineteen, twenty-one, twenty-three, and twenty-five); and two counts of forcible lewd and lascivious acts on a child under 14 (§ 288, subd. (b)(1), counts twenty-seven and twenty-eight).

---

[1] All undesignated statutory references are to the Penal Code.

Next, the information alleged that on or about July 21, 2019 (shortly before 8th grade), Cereda committed one count of aggravated sexual assault of a child under 14—rape (§§ 261, subd. (a)(2) & (6), 269, subd. (a)(1), count twenty-nine).  Then, between August 14, 2019 and September 16, 2019 (8th grade), the information charged Cereda with two counts of aggravated sexual assault of a child under 14—rape (§§ 261, subd. (a)(2) & (6), 269, subd. (a)(1), counts thirty-one and thirty-three); four counts of aggravated sexual assault of a child under 14—oral copulation (§§ 269, subd. (a)(4), 287, subds. (c)(2)-(3) & (d), counts thirty-five, thirty-seven, thirty-nine, and forty-one); and two counts of forcible lewd and lascivious acts on a child under 14 (§ 288, subd. (b)(1), counts forty-three and forty-four).  Finally, for the entire period between August 16, 2017 and September 16, 2019, the information charged with respect to Jane Doe One two counts of aggravated sexual assault of a child under 14—sexual penetration (§§ 269, subd. (a)(5), 289, subd. (a), counts forty-five and forty-seven).[2]  With respect to his other stepdaughter, Jane Doe Two, the information alleged two counts of lewd and lascivious acts on a child under 14 (§ 288, subd. (a), counts forty-nine and fifty) between January 12, 2009 and June 30, 2011.

As to counts two, four, six, eight, ten, twelve, thirteen, fourteen, sixteen, eighteen, twenty, twenty-two, twenty-four, twenty-six, twenty-seven, twenty-eight, thirty, thirty-two, thirty-four, thirty-six, thirty-eight, forty,

---

[2] The information alternatively charged the conduct encompassed by counts one, three, five, seven, nine, eleven, fifteen, seventeen, nineteen, twenty-one, twenty-three, twenty-five, twenty-nine, thirty-one, thirty-three, thirty-five, thirty-seven, thirty-nine, forty-one, forty-five, and forty-seven as 21 counts of forcible lewd and lascivious acts on a child under 14 (§ 288, subd. (b)(1), counts two, four, six, eight, ten, twelve, sixteen, eighteen, twenty, twenty-two, twenty-four, twenty-six, thirty, thirty-two, thirty-four, thirty-six, thirty-eight, forty, forty-two, forty-six, and forty-eight).

forty-two, forty-three, forty-four, forty-six, and forty-eight, enhancements were alleged pursuant to section 667.61 (the One Strike law), subdivision (j)(2) that the crimes were committed against a child under the age of 14 and that Cereda was convicted in the present case of qualifying offenses against more than one victim. Thus, upon conviction, each of these counts would be subject to a mandatory consecutive sentence of 25 years to life. (§ 667.61, subds. (i), (j)(2).) If convicted of the remaining 21 counts involving Jane Doe One, Cereda faced the possibility of mandatory consecutive sentences of 15 years to life. (*Id.*, subds. (b), (c) & (i).)[3]

As to counts forty-nine and fifty involving Jane Doe Two, enhancements were alleged pursuant to section 667.61, subdivision (b) and (e) that the qualifying convictions committed by Cereda involved more than one victim. Thus, under the One Strike Law, conviction under either of these counts would carry mandatory sentencing of 15 years to life. (§ 667.61, subds. (b) & (e)(4).)

## B.    Trial Evidence

Trial was held before a jury over seven days beginning October 20, 2021. The following was among the evidence adduced at trial:

### 1.  Allegations Involving Jane Doe One

Jane Doe One was 16 and in the 10th grade when she testified at trial. She and Jane Doe Two lived with their mother (R.M.), Cereda, and two younger half-brothers in Napa during the relevant portion of Doe One's childhood. R.M. had married Cereda when Jane Doe One was three years old, and she had considered him her father.

---

[3] All 48 counts involving Jane Doe One were ineligible for probation, suspension of sentence, or modification pursuant to section 1385. (§§ 667.61, subds. (g) & (h), 1203.05, subd. (a), 1203.066, subd. (a)(1), (7) & (8).)

4

Jane Doe One testified she was in 6th grade and 11 or 12 years old when Cereda first touched her inappropriately. After taking a shower one evening while R.M. was at work, Cereda had her bend over his lap before she got dressed. He then touched the exterior and interior of Doe One's vagina, telling her R.M. said he needed to make sure she was "cleaned." Jane Doe One told him no, but he responded he needed to check it. She felt weird and like it was not right. Cereda finished, declared her clean, and instructed her not to wear underwear when she was sleeping. She thought this was odd, but agreed because he was her dad. According to Jane Doe One, when she was in the 6th grade, Cereda touched her vagina in this way "a lot," more than two times. He also touched her breasts with his hands "a lot," more than two times, both over and under her clothing. Specifically, Cereda would have her come into his bedroom, tell her to take off her clothes, and have her lay on the bed. He would then touch her breasts and her vagina.

During this timeframe, Cereda also put his penis in her vagina and moved it in and out "a lot," on more than two occasions. He said he wanted to make her feel good. She remembered telling him repeatedly the first time that it hurt, but he stated that was normal and continued anyway. When Doe One asked Cereda why he was doing this, he stated it was because he loved her, and told her it was normal. She felt uneasy but believed him. Cereda additionally had Jane Doe One put his penis in her mouth and "suck it like a popsicle" more than two times during 6th grade. And he put his mouth on her vagina and licked more than two times. When doing so, she would lay on the bed, Cereda would hold her legs up, and then he would put his face between her legs. Jane Doe One also remembered Cereda giving her a wine bottle "to make herself feel good" when he was not around.

After the first incident, Jane Doe One reported to R.M. that Cereda had told her to sleep without underwear. When R.M. confronted him, Cereda told her that he had learned to do this from his grandmother for air circulation. Doe One did not report anything else to her mother at that time because she "thought it was a normal thing." Cereda later complained to her that he had told her not to tell her mom. Moreover, Cereda would tell her from time to time not to tell anyone because he would go away, and R.M. would be very sad. This made Jane Doe One scared and sad because she loved him as a father at that time, did not want him to go away, and did not want her mom to be sad.

Cereda molested Jane Doe One in a similar way when she was in the 7th grade. Specifically, Cereda put his penis in Doe One's mouth, touched her breasts, licked her vagina, touched her vagina inside and outside with his fingers, and inserted his penis into her vagina—each more than two times. However, during the 7th grade, Jane Doe One took a sex education class and learned about consent and "rules against having sex and all that." She began to think Cereda was mistaken, so she told him that she wanted him to "stop doing those things" to her because they were wrong. Cereda told her *she* was wrong, that it was "very normal" for dads to do that to their kids because they love them. He also told her that priests did it to altar boys. Although that did not sound right to her, she thought maybe she was the one who was wrong. The molestations continued.

Cereda also informed Jane Doe One that if she told anybody he would go to jail and get beaten up and raped by other inmates. Jane Doe One did not want that to happen to him at that point. Nevertheless, she took an opportunity when she was alone in the car with R.M. to tell her what had been going on because it was wrong, and she wanted it to stop. Her mother

got angry, yelled at her, and told her she should not say things like that, or her grandfather might kill Cereda. Her mother got so angry that Jane Doe One said she was sorry and recanted her accusations. R.M.'s response made her feel sad and regretful. She felt that she "was wrong for what [she] was feeling. Just all so many [] emotions that were basically saying [she] shouldn't have told her."

During the summer between 7th and 8th grades, Jane Doe One "just couldn't handle it anymore" and told her partner about the sexual abuse. The partner encouraged Jane Doe One to make a recording of a molestation to obtain evidence against Cereda. Jane Doe One tried multiple times to bring her cellphone into the bedroom to make a recording, but Cereda would not allow it. Then one day he told her to bring her phone into the room in case R.M. called. Jane Doe One surreptitiously started an audio recording while Cereda undressed and placed the phone on the bed. She recorded him while he touched her breasts and put his penis in her vagina.

Both the original recording and a digitally enhanced version were played for the jury. R.M. confirmed that the voices on the recording were Cereda and Jane Doe One. In the recording, Cereda can be heard saying things such as: "Is it good?"; "Does it feel good now?"; "I'm fucking you."; "It's supposed to make you come."; and "I got to get a finger inside you." The comments can be heard above background sounds like heavy breathing, rhythmic rubbing sounds, wet kissing, sucking sounds, and Jane Doe One whimpering and crying. When Jane Doe One protested—repeatedly saying "No" and "I don't want to do that"—Cereda replied with "I don't care," "Kiss me," and "It's not wrong," while continuing to abuse her.

Once 8th grade began, Cereda continued to molest Jane Doe One in a similar way, putting his penis in Doe One's mouth, touching her breasts,

7

licking her vagina, touching her vagina inside and outside with his fingers, and inserting his penis in her vagina—each more than two times. During these incidents, Cereda's penis was erect, and he sometimes ejaculated into her mouth and vagina. When Cereda put his penis in Jane Doe One's vagina, she laid on the bed and he stood, holding her legs on either side of his waist. She could move a little bit, but she could not leave. During one incident, Jane Doe One said no to Cereda and tried to leave the room, but he grabbed her roughly by the arm and tossed her onto the bed. Another time, she told Cereda: "This is wrong, stop." She felt like there was nothing she could do to make it stop. Cereda also gave Jane Doe One a silicone penis "to make herself feel good" when he was not around. Cereda sometimes put the sex toy inside Jane Doe One's vagina himself. He occasionally used a spray bottle of lubricant that was located in his side table drawer during the molestations.[4]

Towards the end of September 2019, Jane Doe One took the recording she had made to a school counselor and explained what had been happening between her and Cereda. The school counselor called the police. That same day, R.M. spoke with the police and agreed to make a pretext phone call with Cereda, a copy of which was played for the jury. During that call, Cereda gradually admitted to sexually assaulting Jane Doe One. Cereda reported that it started when Jane Doe One walked in on him when he was getting in the shower "and it just went out of control from there." He admitted that she gave him a blow job twice, stating that he was "teaching" her. And he acknowledged he "went down" on Jane Doe One "maybe a dozen" times. He stated that it had been going on for about a year and that Jane Doe One

---

[4]The police subsequently searched the family home and found a bottle of lubricant in a bedside table in the master bedroom.

8

would probably say the last time they had sex was the previous week.  R.M. testified that Cereda weighed approximately 350-375 pounds in late 2019.

### 2.     *Allegations Involving Jane Doe Two*

Jane Doe Two was 20 years old when she testified at trial.  She was seven years old when her mother became romantically involved with Cereda. She considered him a stepfather, as she also had a relationship with her biological father.  Jane Doe Two "vaguely" remembered living in San Bernardino when she was younger, sometime after Cereda and R.M. got married.  It was before she moved to Germany for a year with her biological father where she turned 12.  When asked whether Cereda ever did anything that made her uncomfortable or upset when they lived together, Jane Doe Two testified:  "There were times when he would pinch my butt and poke my sides."  This touching upset her and even when she would repeatedly tell him to stop, that it was uncomfortable for her, he did not.  He had been doing this as long as she could remember.  She did not remember much about when she was younger, but she could recall it happening when she was around 13 or 14.

An investigator from the District Attorney's Office who was trained in conducting interviews of victims of sexual abuse interviewed Jane Doe Two on the day Jane Doe One reported Cereda's abuse. Initially, Jane Doe Two was chatty.  When the investigator asked her about Cereda she stated she had never had a good relationship with him.  "Very obviously she disliked him."  When the investigator spoke with her about what had happened to her younger sister, Jane Doe Two became "angry and upset."  She told the investigator that, if she had known what was going on, she would have killed Cereda.  But she denied that Cereda had ever touched her in a sexual way.

9

When R.M. questioned Cereda in the pretext call as to whether he had done anything with Jane Doe Two, he responded that he had done "some educational stuff"—he "pointed and showed her things on [his] body and her body." Cereda reported it was when they lived in San Bernardino before Jane Doe Two went to live with her dad, probably when she was 11 years old. Later he admitted he touched her and made her feel good on her privates probably 10 times. Jane Doe One testified that Cereda once told her he had done the same thing to Jane Doe Two when she was younger all the way until she was 16 years old. The two girls never mentioned the abuse to each other.

### 3. *Cereda's Testimony*

Cereda took the stand in his own defense. He remembered a time when R.M. told him that Jane Doe One had accused him of sexual misconduct. He was extremely angry and threatened to move out. However, R.M. told him that she had handled it and that Jane Doe One had admitted it was a lie. According to Cereda, he walked in on Jane Doe One at one point when she was masturbating with a selfie stick. Cereda was worried she would hurt herself. He had previously purchased a dildo for R.M. but never gave it to her, so he gave it to Jane Doe One along with a bottle of lubricant.

Cereda further testified that he was not telling the truth when he made numerous admissions in the pretext call regarding sexual contact with Jane Doe One. He was "kind of angry" since this was the second time this kind of thing had come up, and he told R.M. "what she want[ed] to hear" so she would get Jane Doe One into therapy. The man on the audio recording was not him because he never had sex with Jane Doe One and it was "clearly not [his] voice." He also thought Jane Doe Two needed therapy as she had returned from her time with her biological father "withdrawn and quiet . . . [and] was pulling her hair out." When R.M. asked him about Jane Doe Two

10

on the pretext call, Cereda lied and said he did things with her. He explained: "And at that point again I'm not a hundred percent thinking logically, but I'm thinking, well, you know, here's my chance. I can tell [R.M.], yes, I touched her, and she'll try to get Jane Doe Two into some therapy too." However, Cereda admitted he realized the police would likely be involved at this point because the school had found the audio recording.

### 4. CSAAS Testimony

Dr. Blake Carmichael, a clinical psychologist with the University of California Davis Children's Hospital, testified as an expert in child sexual abuse, suggestibility, and the effects of abuse on children. Dr. Carmichael stated that CSAAS is a theory developed in the 1980's to educate people and dispel myths and misconceptions about the behavior of children who have been sexually abused, a population "most people may not encounter or experience." He explained that "[e]ven with popular media accounts today, that doesn't accurately depict what we know about kids who have been sexually abused." Some of the common misconceptions include: (1) the idea that children are mostly sexually abused by strangers; (2) the idea that children ordinarily report sexual abuse immediately; and (3) the expectation that children will describe such abuse consistently when questioned over time. According to Dr. Carmichael, child abuse should be understood in the context of a relationship. It is often committed by a loving, caring, attentive adult that has sexual access to the child. It occurs between a bigger, stronger, more sophisticated adult in a position of trust/authority and a smaller, weaker, more vulnerable child. Moreover, there is no one way children respond to the trauma of the abuse.

Dr. Carmichael then described the five components of CSAAS. First, the relationship is controlled through *secrecy*. Thus, abusers will instruct the

child not to tell and may threaten them with negative consequences if they do tell.  Despite such threats, many children continue to love their abusers.  Second, *helplessness* is inherent in the uneven power dynamic between the adult abuser and the child, and it is enhanced when the abuser is responsible for caring for the child.  It makes the child feel powerless to control the situation.  The child may feel trapped by the negative consequences of disclosure.  Even with the greater community awareness about sexual abuse over the last 40 years and children being educated to say no, run, and tell, they still often do not fight back or disclose.

The third component, *entrapment and accommodation,* describes how abused children cope.  Children may make ineffective behavioral changes in an attempt to avoid abuse, such as pretending to be asleep or avoiding parts of the house.  Emotionally, they may dissociate from the experience by focusing on something else, which may make detailed recall difficult.  Children may respond by appearing unaffected when discussing the abuse.  *Delayed, unconvincing, or conflicted disclosure*, the fourth component, reflects the fact that children may disclose a significant amount of time after the abuse, and some may never tell at all.  Moreover, children may have a harder time describing the trajectory of the abuse because they have not yet mastered abstract concepts like time, sequence, order, and duration.  Or it may have happened so many times they cannot recall specifics and may provide conflicting information.  They may provide more or different details throughout the disclosure process.  Finally, the fifth component, *recantation*, notes that it is not uncommon for victims of sexual abuse to disclose and then retract the disclosure out of guilt or because of the reaction of the person to whom they disclosed.  Current research shows that this continues to be something abused children do.

## C.     *Verdicts and Sentencing*

On October 29, 2021, the jury found Cereda guilty on all counts and found true all special allegations.  The prosecution recommended a term of 690 years to life at sentencing.  Specifically, it noted that the 27 counts under section 288, subdivision (b)(1) with respect to Jane Doe One (counts two, four, six, eight, ten, twelve, thirteen, fourteen, sixteen, eighteen, twenty, twenty-two, twenty-four, twenty-six, twenty-seven, twenty-eight, thirty, thirty-two, thirty-four, thirty-six, thirty-eight, forty, forty-two, forty-three, forty-four, forty-six, and forty-eight) were subject to mandatory consecutive sentencing of 25 years to life (27 x 25 = 675).  It recommended that the court use its discretion to run one of the two counts involving Jane Doe Two concurrently and sentence the other consecutively at the statutorily required 15 years to life, for a total of 690 years to life.  The prosecutor acknowledged that the sentences with respect to the other 21 counts involving Jane Doe One should be imposed and stayed pursuant to section 654 as they were based on the same incidents as the convictions under section 288, subdivision (b)(1).  Given the well-documented long-term effects of child sexual abuse—which become more acute when the abuse is more frequent, more severe, and/or of longer duration—the prosecution additionally requested that the court award noneconomic restitution of $750,000 to Jane Doe One, $25,000 to Jane Doe Two, and $50,000 to R.M., the mother of the two direct victims.[5]

At the sentencing hearing on December 15, 2021, the trial court heard a victim impact statement from R.M., who stated Cereda had ruined their lives and they had not yet begun to heal because he had lied throughout the

---

[5] Section 1202.4, subdivision (f)(3)(F) provides that victims may recover "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7."

trial. Defense counsel—suggesting that the anticipated sentence violated the prohibition against cruel and unusual punishment—requested that the court override the statutory scheme and impose one or two sentences of 25 years to life. He also objected to the requested noneconomic damages, arguing that the awards were arbitrary and that there was no factual basis for them.

Noting that it was considering the "horrific reality" Jane Doe One endured for years, the court imposed the total term as recommended by the prosecutor of 690 years to life. Pursuant to section 654, it imposed and stayed sentences of 15 years to life for each of the remaining counts involving Jane Doe One. The court additionally awarded noneconomic restitution to Jane Doe One, Jane Doe Two, and R.M. as requested by the prosecution. In doing so, the court disagreed with defense counsel that the awarded amounts were arbitrary, opining: "I think the numbers requested by the People in this case are reflective of the deep and enduring pain that Mr. Cereda inflicted on the victims in this case."

This appeal followed.

## II. DISCUSSION

### A. *Sufficiency of Evidence of Duress With Respect to Jane Doe One*

Cereda first asserts that 46 of his 48 convictions with respect to the sexual offenses involving Jane Doe One must be reversed because there was insufficient evidence that the sex acts underlying those convictions had been accomplished through "force, violence, duress, menace, or fear of immediate and unlawful bodily injury."[6] Specifically, he argues that Jane Doe One's testimony "makes clear that she permitted the sexual activity that occurred

---

[6] Unsurprisingly, Cereda does not challenge his convictions with respect to counts 29 and 30 on this basis as they related to the July 2019 incident surreptitiously recorded by Jane Doe One and played for the jury as detailed above.

14

in this case because she loved [him] and she believed him when he told her that what they were doing was 'normal' [citation] and not because of threats or coercion, either physical or mental."  We are not persuaded, finding more than ample evidence that Cereda's repeated molestations of Jane Doe One over the course of years were accomplished through duress.[7]

### 1.    *Legal Framework and Standard of Review*

The convictions Cereda challenges were for aggravated sexual assault of a child under 14 (rape, oral copulation, or sexual penetration) as well as forcible lewd and lascivious acts on a child under 14.  All of these crimes can be accomplished through use of duress.  (See § 288, subd. (b)(1) [forcible lewd act on a child under 14 defined as lewd act committed "by use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person"]; § 261, subd. (a)(2) [defining rape as sexual intercourse "accomplished against a person's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the person or another"]; § 287, subd. (c)(2)(B) [criminalizing "an act of oral copulation upon a person who is under 14 years of age, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person"]; § 289, subd. (a)(1)(B) [criminalizing "act of sexual penetration upon a child who is under 14 years of age, when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person"]; see also § 269, subd. (a)(1), (4) & (5) [aggravated sexual

---

[7] Since we find substantial evidence of duress here, we do not consider whether the record also supports a finding of force, violence, menace, and/or fear of immediate or unlawful bodily injury.

assault of a child includes rape pursuant to § 261, subd. (a)(2), oral copulation in violation of § 287, subd. (c)(2), and sexual penetration under § 289, subd. (a).)  While all of these crimes involve duress, the term has been defined somewhat differently in different situations.

The rape statute specifically defines duress to mean "a direct or implied threat of force, violence, danger, or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or acquiesce in an act to which one otherwise would not have submitted.  The total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress."  (§ 261, subd. (b).)  In contrast, duress in the context of other sexual offenses involving minors has consistently been defined somewhat more broadly by the courts to mean " 'a direct or implied threat of force, violence, danger, *hardship*[,] or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' "  (*People v. Leal* (2004) 33 Cal.4th 999, 1004 (*Leal*); accord, *People v. Soto* (2011) 51 Cal.4th 229, 246 (*Soto*).)

In *Leal*, the Supreme Court rejected the assertion that the arguably less broad definition of duress amended into the rape statute in 1993 should be read to apply outside of the context of that statute.  (*Leal*, *supra*, 3 Cal.4th at pp. 1006–1009.)  As the Court explained:  "The Legislature might well have wished to apply a somewhat broader definition of 'duress' in cases involving sexual abuse of a child under the age of 14 years.  The Legislature may have wished to protect children against lewd acts committed by threats of hardship despite its determination that similar threats of hardship should

16

not provide the basis for the crime of rape or spousal rape against an adult." (*Id.* at p. 1008.)

Duress can take the " 'form of psychological coercion to get someone else to do something.' " (*Soto, supra*, 51 Cal.4th at p. 243; see *People v. Cochran* (2002) 103 Cal.App.4th 8, 15 (*Cochran*), overruled on other grounds in *Soto*, at p. 248, fn. 12.) The definition of duress is "objective in nature and not dependent on the response exhibited by a particular victim." (*Soto, supra*, 51 Cal.4th at p. 246.) With respect to child sexual abuse in particular, the *Soto* Court held that when the Legislature amended section 288, subdivision (b) in 1981 to delete the requirement that the lewd acts "be 'against the will of the victim,' it effectively removed the concept of consent from child molestation cases." (*Id.* at p. 245.) In doing so, "the Legislature kept the focus on the conduct of the assailant. It recognized that there is an inherent imbalance of power in an encounter between a child and an adult bent on sexual conduct. It acted to protect young children, who may make ill-advised 'choices' when under the coercive influence of an overreaching adult." (*Id.* at pp. 245–246.) Thus, duress can be established by "a defendant's attempt to isolate the victim and increase or maintain [the victim's] vulnerability to his assaults." (*Cochran*, at p. 15.) And, "[w]hen the victim is young and is molested by her father in the family home, duress will be present *in all but the rarest cases*." (*People v. Thomas* (2017) 15 Cal.App.5th 1063, 1072–1073, italics added.)

The framework undergirding our substantial evidence analysis is well settled. " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a

17

reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. [Citation.] A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*People v. Linberg* (2008) 45 Cal.4th 1, 27.)" (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890; accord, *People v. Odom* (2016) 244 Cal.App.4th 237, 246.)

### 2.    *Substantial Evidence of Duress in Record*

Here, with respect to all of the sexual assaults on Jane Doe One other than those involving rape, it is relatively easy to find substantial evidence of duress, specifically that Cereda employed direct threats of hardship—that her mother would be sad, that he would leave the family home, that he would be sent to jail and raped—to coerce Jane Doe One into acquiescing in or performing acts she would not otherwise have submitted to or done. Cereda, however, argues that these threats are insufficient to establish duress because they were intended to discourage *disclosure* not to coerce Jane Doe One into complying with his sexual wishes. We disagree. This argument comes from *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1251, fn.7, overruled on other grounds in *Soto*, at p. 248, fn. 12, a decision of the Fourth District, Division One, which that same court later specifically rejected as overbroad, reasoning: "A threat to a child of adverse consequences, such as suggesting the child will be breaking up the family or marriage if she reports or fails to acquiesce in the molestation, may constitute a threat of retribution and may be sufficient to establish duress, particularly if the child is young

18

and the defendant is her parent. We also note that such a threat also represents a defendant's attempt to isolate the victim and increase or maintain her vulnerability to his assaults." (See *Cochran*, *supra*, 103 Cal.App.4th at p. 15.) We agree that such threats are part and parcel of the psychological control Cereda established over Jane Doe One in order to gratify his sexual urges.

We also reject Cereda's argument that Jane Doe One participated in the sexual activity, not because she was coerced, but because she loved Cereda and thought the sexual behavior was normal. Jane Doe One testified that Cereda's threats were effective because, among other reasons, at that point she still loved him. But she testified that she listened to him when he told her what to do because he was "her dad." This was evidence, not of affection, but of Cereda's dominance and authority over her. Moreover, although Cereda repeatedly told her the abuse was normal, she said "no" and "don't touch there" from the first incident, stating that she felt weird, and that something was not right. Jane Doe One testified variously that the situation made her feel sad, uneasy, scared, helpless, wrong for what she was feeling, and like there was nothing she could do to make it stop. She continued to question the idea that the abuse was normal as she grew older and more sexually knowledgeable. And she acquiesced, though she knew it was wrong even if priests did it. Finally, she pushed herself to make the audio recording because she "couldn't handle it anymore." Thus, Jane Doe One did not engage in the sexual activities because she truly believed they were normal, she gave in because Cereda repeatedly counseled her not to trust her own instincts, another form of psychological coercion.

Moreover, even if, at times, Jane Doe One convinced herself the abuse was normal, this would not change our analysis. Since duress is measured by

19

a purely objective standard, a jury could find that Cereda used threats and coercion to commit the molestations without ever resolving how Jane Doe One subjectively perceived or responded to this behavior. As our high court held in Soto: "A perpetrator may *use* duress, menace, or threats against a victim even if this conduct does not ultimately influence the victim's state of mind. In the context of lewd acts with a child under 14, *it is the defendant's menacing behavior that aggravates the crime* and brings it under section 288(b)." (*Soto, supra,* 51 Cal.4th at p. 243, some italics added.)

Finally, with respect to the rape counts, we question whether the psychological coercion and threats in this case are insufficient to establish duress when rape is charged in the context of the aggravated sexual assault of a child under 14. (See § 269; *People v. Figueroa* (2008) 162 Cal.App.4th 95, 98 [" '[T]he Legislature intended [in section 269] to aggravate punishment for forcible sexual offenses where the defendant's culpability is increased by a substantial age disparity.' "].) While the statutory definition of duress in the context of rape deletes "hardship," it also indicates that "[t]he total circumstances, including the age of the victim, and the victim's relationship to the defendant, are factors to consider in appraising the existence of duress." (§ 261, subd. (b)(1).) And the *Leal* Court posited that the Legislature, in removing hardship from the rape statute, "may have wished to protect children against lewd acts committed by threats of hardship despite its determination that similar threats of hardship should not provide the basis for the crime of rape or spousal rape against an adult." (*Leal, supra,* 3 Cal.4th at p. 1008.) Thus, at least arguably, duress should have the more expansive meaning otherwise applied to child sexual abuse when rape is charged as aggravated sexual assault of a child under 14.

Even if it does not, however, we find substantial evidence of implied threats of force in this case. Jane Doe One was a young child when the abuse occurred, and Cereda was a 350-375 pound older man. Jane Doe One testified that during the first rape, Cereda failed to stop despite her telling him he was hurting her. When she orally copulated him, she was on her knees while Cereda stood over her. When Cereda licked her vagina and raped her, he had her lay on the bed and held her legs up on either side of his body while he stood in the middle. While she could move around a little, she could not escape him. During one incident, Jane Doe One said no to Cereda and tried to leave the room, but he grabbed her roughly by the arm and tossed her onto the bed. Given the size disparity between Cereda and Jane Doe One, his failure to stop when she said no or it hurt, and his position of dominance and authority over her—both generally and physically when he engaged in sexual acts with her—it is a reasonable inference that Cereda was using both psychological coercion and implied threats of force to bend Jane Doe One to his will.

The following exchange captured on the audio recording played for the jury (and which Cereda does not challenge for insufficient evidence of aggravated rape of a child) is particularly telling:

Cereda: "Now, give it to me."

Jane Doe One: "No. I don't want to do that. I don't want to do that."

Cereda: "I don't care. You need to feel good."

Jane Doe One: "No."

Cereda: "good."

Jane Doe One: "No."

Cereda: "Yes."

Jane Doe One: (whimpers)

Cereda:  "There we go."

Jane Doe One:  "Uh huh."

Cereda:  "I don't care anymore.  Kiss me."

Jane Doe One:  "No."

Cereda:  "It's not wrong.  It's not wrong."

Jane Doe One:  "[U]h huh."

Cereda:  "It's not wrong."

Jane Doe One:  "Uh huh."

Cereda:  "It's not wrong."

Jane Doe One:  "No."

Cereda:  "It's okay.  It's okay."

Jane Doe One:  "No.  I really don't want to.  I don't want to do it."

(Rubbing Sounds.)

Cereda:  "Good?"

Jane Doe One:  "Uh huh."

(Reformatted and references to some background noises and unintelligible portions omitted for purposes of clarity.)  Given the other evidence in the record, it is reasonable to assume that this physical aggression (or an implied threat thereof) was typical of Cereda's sexual interactions with Jane Doe One.  In sum, we reject all of Cereda's substantial evidence challenges.

**B.      *Corpus Delicti for the Two Convictions Involving Jane Doe Two***

As stated above, Cereda was convicted in counts forty-nine and fifty of lewd and lascivious conduct with Jane Doe Two in violation of section 288, subdivision (a).  Cereda maintains that since his admissions were the only evidence that the alleged sexual acts occurred, his convictions for these counts run afoul of the corpus delicti rule and must be reversed.  We reach the opposite conclusion.

22

### 1.     *Legal Framework and Standard of Review*

"In every criminal trial, the prosecution must prove the corpus delicti, or the body of the crime itself—i.e., the fact of injury, loss, or harm, and the existence of a criminal agency as its cause.  In California, it has traditionally been held, the prosecution cannot satisfy this burden by relying *exclusively* upon the extrajudicial statements, confessions, or admissions of the defendant.  [Citations.]  Though mandated by no statute, and never deemed a constitutional guaranty, the rule requiring some independent proof of the corpus delicti has roots in the common law.  [Citation.]  California decisions have applied it at least since the 1860's." (*People v. Alvarez* (2002) 27 Cal.4th 1161, 1168–1169 (*Alvarez*).)  "The purpose of the corpus delicti rule is to assure that 'the accused is not admitting to a crime that never occurred.' " (*People v. Jones* (1998) 17 Cal.4th 279, 301 (*Jones*).)

Evidence of the corpus delicti of a crime "may be circumstantial and need not prove the crime beyond a reasonable doubt but is sufficient if it permits an inference of criminal conduct, even if a noncriminal explanation is also plausible." (*Alvarez, supra*, 27 Cal.4th at p. 1171.)  "There is no requirement of independent evidence 'of every physical act constituting an element of an offense,' so long as there is some slight or prima facie showing of injury, loss, or harm by a criminal agency." (*Ibid.*, quoting Jones, *supra*, 17 Cal.4th at p. 303.)  As our Supreme Court has explained:  "The amount of independent proof of a crime required for this purpose is quite small; we have described this quantum of evidence as 'slight' [citation] or 'minimal' [citation].  The People need make only a prima facie showing ' "permitting the reasonable inference that a crime was committed." ' [Citation.]  The inference need not be 'the only, or even the most compelling, one . . . [but need only be] a reasonable one." (*Id.* at pp. 301–302.)  "In every case, once

23

the necessary quantum of independent evidence is present, the defendant's extrajudicial statements may then be considered for their full value to strengthen the case on all issues." (*Alvarez*, at p. 1171.)

Lewd and lascivious conduct as was alleged in counts forty-nine and fifty is proven where "a person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child." (§ 288, subd. (a).) It is undisputed that Jane Doe Two was under the age of 14 when the family lived in San Bernardino. And the parties generally agree on the direct evidence that was produced at trial relevant to these counts. Moreover, it is indisputable that, if considered, Cereda's admissions provide substantial evidence supporting the challenged convictions. Under these circumstances, we are faced only with the legal question of whether there was sufficient other evidence to establish the corpus delicti of lewd and lascivious acts by Cereda on Jane Doe Two. (See *Jones*, *supra*, 17 Cal.4th at p. 302.) In other words, we must determine whether the trial evidence is sufficient—apart from Cereda's admissions on this point—to provide a slight prima facie showing permitting a reasonable inference that Cereda touched Jane Doe Two unlawfully within the meaning of section 288, subdivision (a) when she lived in San Bernardino.

### 2. *Sufficient Evidence of Corpus Delicti in this Case*

We have little difficulty here finding that slight evidence. In denying Cereda's section 1118.1 motions as to counts forty-nine and fifty on these same grounds, the trial court identified as slight evidence "of something, of some harm" Jane Doe Two's testimony that 13 or 14 years old was "the earliest time that she remembers [Cereda] pinching her butt and poking her

24

sides. It was in a way that upset her. She doesn't like to be touched. There were numerous times that he pinched or poked her butt or sides." We agree that this is relevant evidence in establishing the corpus delicti for counts forty-nine and fifty. Even Cereda concedes that it could be argued that the poking and pinching was sexually motivated, but he dismisses its relevance because it occurred in the wrong timeframe. However, given Jane Doe Two's inability to remember much about her childhood in San Bernardino, her clear dislike of Cereda, her extreme reaction when she learned what Jane Doe One had suffered at Cereda's hands, and her decision to live abroad with her biological father shortly after the family resided in San Bernardino, we believe that the evidence is also relevant to whether Cereda harmed Jane Doe Two in some way that made her uncomfortable at an earlier time. Put another way, although a noncriminal explanation for all of these facts is certainly possible, they provide some evidence permitting a reasonable inference that Jane Doe Two had been harmed by Cereda in some way prior to her exit from the family home to live with her biological father.

As to whether she was harmed in a criminal way during that timeframe, we have here all of the direct testimony of Jane Doe One regarding the continuous sexual abuse she suffered at Cereda's hands when she was of an age similar to Jane Doe Two's age when Doe Two resided in San Bernardino. Evidence Code section 1108 provides that "evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible" as propensity evidence under section 1101 "if the evidence is not inadmissible" under [Evidence Code] section 352. (Evid. Code § 1108, subd. (a).) Evidence Code section 1108 also authorizes juries to consider a charged sexual offense that the jury has already determined that the defendant committed to prove the defendant's propensity to commit another

25

sexual offense charged in the same case. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160-1161.) Given the similarity in age of the two sisters when the alleged abuse occurred, Cereda's propensity to commit such acts, and the other evidence of unwanted touching of Jane Doe Two at Cereda's hands as described above, we conclude that the corpus delicti for the charged offenses involving Jane Doe Two was established without reference to any of Cereda's own statements.[8]

## C. CSAAS Issues

Cereda next claims that Dr. Carmichael's testimony in this case with respect to CSAAS was irrelevant and inadmissible because, as a general matter, there are no longer misconceptions regarding child sexual abuse and, specifically, the jury in this case indicated that it did not hold any such misconceptions. In a related vein, Cereda argues that the pattern jury instruction on CSAAS testimony, CALCRIM No. 1193, violated his constitutional due process and jury trial rights by misleading jurors into

---

[8] *People v. Ramirez Ruiz* (2020) 56 Cal.App.5th 809, relied upon by Cereda, is easily distinguishable. In that case, there was direct testimony from the victim that the first time sexual abuse occurred was about " 'three months before' " she disclosed being abused. The record established the victim was 11 years old at the time of the disclosure and for the preceding eight months, having been born in January 2016 and having disclosed in September 2016. (*Id.* at p. 833.) Under these circumstances, Division Two of this District concluded that the corpus delicti was not established for oral copulation or sexual penetration with a child 10 years old or younger because there was no other evidence besides a statement made by Ramirez Ruiz that any sexual misconduct occurred when the victim was 10 years old or younger. (*Ibid.*)

thinking that the expert testimony could be used as evidence supporting the truth of the Does' allegations. We find neither contention convincing.

### 1. *Admissibility of CSAAS Testimony*

#### i. *Additional background*

During motions in limine, defense counsel objected to the prosecution's proposed CSAAS testimony, arguing that times had changed and that jurors no longer had misconceptions about child sexual abuse. While it acknowledged that CSAAS testimony can be problematic if it is presented without adequate "guardrails," the trial court concluded that CSAAS testimony was permissible under long-established precedent. The trial court specifically found that Dr. Carmichael had training and experience that would assist the trier of fact and stated it would be giving limiting instructions.

During jury voir dire, the prosecutor questioned each panel generally about several possible preconceived notions regarding sexually abused children. It appears the jurors responded with hands or nods of the head. The questions included: (1) whether jurors recognized that child molesters come from "all walks of life"—including parents, teachers, and coaches; (2) whether jurors understood that victims of child sexual abuse might respond in a variety of ways; (3) whether jurors recognized that sexually abused children might not report the abuse "right away or report the crime at all"; and (4) whether jurors would expect child victims of sexual abuse to remember all of the details of the crime. Not all of these questions were asked during each panel. Sometimes the prosecutor asked panel members whether they had any responses to questions she had asked prior panels.

After a jury was selected, defense counsel renewed his objection to Dr. Carmichael's testimony, arguing that, given the prosecutor's thorough voir

dire, none of the 96 prospective jurors in the pool "have the slightest misconception about victim behavior in the way that Child Sexual Abuse Accommodation Syndrome evidence is meant to fix." The trial court declined to change its earlier ruling. It stated that it believed it had placed sufficient guardrails on the testimony and that the probative value of the testimony was not outweighed by any juror confusion or undue consumption of time.

ii. *Legal Framework and Standard of Review*

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Evidence Code section 210 defines relevant evidence as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." In other words, "[r]elevance is a low bar." (*People v. Villa* (2020) 55 Cal.App.5th 1042, 1052.) A trial court's conclusions with respect to relevancy are discretionary and reviewable only for abuse. (*People v. Jablonski* (2006) 37 Cal.4th 774, 821.) However, under Evidence Code section 352, a trial court has "broad discretion . . . to exclude even relevant evidence if it determines the probative value of the evidence is substantially outweighed by its possible prejudicial effects." (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Specifically, a trial court "may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) Prejudice in this context " 'is not synonymous with "damaging," but refers instead to evidence that " 'uniquely tends to evoke an emotional bias against [a] defendant' " without regard to its relevance on material issues [citations].' " (*People v. Zepeda* (2008) 167 Cal.App.4th 25, 35.)

Expert opinion testimony is admissible if it is "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) As our Supreme Court has explained, " '[t]he decisive consideration in determining the admissibility of expert opinion evidence is whether the subject of inquiry is one of such common knowledge that [people] of ordinary education could reach a conclusion *as intelligently as the witness* or whether, on the other hand, the matter is sufficiently beyond common experience that the opinion of an expert would *assist* the trier of fact.' " (*People v. Chapple* (2006) 138 Cal.App.4th 540, 547, quoting *People v. Cole* (1956) 47 Cal.2d 99, 103, italics added.) Thus, " 'the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert opinion may be admitted whenever it would 'assist' the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information.' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300 (*McAlpin*).) "[T]he decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' " (*Id.* at p. 1299.)

Trial courts may admit CSAAS evidence to disabuse jurors of commonly held myths or misconceptions about child sexual abuse. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1300–1301.) "While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse." (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*), citing cases; *People v. Munch*

29

(2020) 52 Cal.App.5th 464, 468, 472–473 (*Munch*) [citing California cases that "have long recognized the well-established relevance, necessity, reliability, and importance of this evidence"].)  " 'Such expert testimony is needed . . . to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (*McAlpin*, at p. 1301.)  "Admission of evidence such as CSAAS is not error merely because it was introduced as part of the prosecution's case-in-chief rather than in rebuttal.  The testimony is pertinent and admissible if an issue has been raised as to the victim's credibility." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1745.)

> ### iii.    No Abuse of Discretion in Admitting CSAAS Testimony

Although Cereda baldly asserts on appeal that the CSAAS testimony in this case was inadmissible because there are no longer misconceptions regarding child sexual abuse that need correcting, he provides no evidence or analysis supporting this claim.  We will therefore not consider it further. (*People v. Freeman* (1994) 8 Cal.4th 450, 482, fn. 2 [a reviewing court need not discuss claims that are asserted perfunctorily and insufficiently developed].)  Suffice it to say that several courts have recently rejected this assertion.  (*Lapenias*, *supra*, 67 Cal.App.5th at p. 172; *Munch*, *supra*, 52 Cal.App.5th at p. 468.)

Cereda's more meaty claim is that the prosecution's voir dire of jury members in this case established that they had no misconceptions about the behavior of sexually abused children, and thus the CSAAS testimony was inadmissible.  This argument, however, misapprehends both the significance of the voir dire in this case and the scope of the admissibility of expert testimony.

That the prosecutor briefly mentioned several misconceptions to panels of potential jurors during voir dire and no juror raised a specific objection

means, at most, that the jurors had no issues with what the prosecutor stated in the abstract. At worst, potential jurors might have been embarrassed to state their disagreement while everyone else nodded or might not have been aware of the misconceptions they harbored. In addition, the prosecutor did not discuss all of the possible misconceptions later testified to by Dr. Carmichael, and certainly did not discuss them in depth, explaining the underlying reasons and psychology behind them. As just one example, while the prosecutor asked if potential jurors understood that molesters could be family members, Dr. Carmichael testified at length about how child sexual abuse must be understood in terms of the relationship between the abuser and the abused and how the molestation's relational nature impacted things such as secrecy and delayed disclosure. He also explained how coping mechanisms like dissociation and physical conditions such as brain development might impact a child victim's recall.

As stated above, a jury need not be *wholly ignorant* of the subject matter of the opinion in order to justify its admission. (*McAlpin*, *supra*, 53 Cal.3d at p. 1299.) Rather, " ' "[i]t will be excluded only when it would add nothing at all to the jury's common fund of information." ' " (*Id.* at p. 1300.) The CSAAS testimony was clearly relevant in this case involving delayed disclosure by one victim and no disclosure by the other, the dynamics of a parent-child relationship, inconsistent disclosures, and a recantation. It was not cumulative or prejudicial. Instead, it added to the jury's common fund of information with respect to child sexual abuse. We see no error in its admission, and certainly no abuse of discretion.

## 2.     *Constitutionality of CALCRIM No. 1193*

### i.     *Additional Background.*

During his CSAAS testimony, Dr. Carmichael confirmed that he had no specific information about the present case and that he was not providing an opinion as to whether or not Jane Does One and Two had been sexually abused.  Moreover, he stressed that CSAAS is not a tool to determine whether any specific child has been abused and that no existing measure or tool can do that.  Dr. Carmichael also testified that the creator of CSAAS has since been critical about how the theory has sometimes been used in courts.  Specifically, "[h]e was critical of defense attorneys using it to say abuse did not occur, and he was equally critical of prosecutors saying, using it to say abuse did occur."

The jury in this case was instructed three times with a modified version of CALCRIM No. 1193—twice during Dr. Carmichael's testimony and once before deliberations.  Specifically, the court instructed:  "You have heard testimony from Dr. Blake Carmichael regarding child sexual abuse accommodation syndrome.  [¶]  Dr. Blake Carmichael's testimony regarding child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged.  [¶]  You may consider this evidence only in deciding whether or not Jane Doe [One] and Jane Doe [Two]'s conduct was not inconsistent with the conduct of someone who has been molested, *and in evaluating the believability of their testimony*.  (Italics added.)

### ii.     *Legal Framework and Standard of Review*

"We review a claim of instructional error de novo.  [Citation.]  The challenged instruction is considered 'in the context of the instructions as a

32

whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Rivera* (2019) 7 Cal.5th 306, 326.)

More specifically, the language of CALCRIM No. 1193 has been upheld as accurately informing the jury of the limited use of CSAAS evidence (see *People v. Ortiz* (2023) 96 Cal.App.5th 768, 815–816; *Lapenias, supra,* 67 Cal.App.5th at pp. 175–176; *Munch, supra,* 52 Cal.App.5th at pp. 473–474; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503–504 (*Gonzales*).) We find the analysis in *Gonzales* particularly instructive. There, the appellate court opined: "A reasonable juror would understand CALCRIM No. 1193 to mean that the jury can use [the CSAAS] testimony to conclude that [the alleged victim's] behavior does not mean she lied when she said she was abused. The jury also would understand it cannot use [the CSAAS] testimony to conclude [the alleged victim] was, in fact, molested. The CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [the CSAAS] testimony will find both that [the alleged victim's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested. There is no conflict in the instruction." (*Gonzales,* at p. 504.)

### iii. No Instructional Error.

Arguing that there is "no meaningful distinction" between using CSAAS testimony to evaluate a complaining witness's believability and using it to determine whether that witness's claim of molestation is true, Cereda maintains that the last phrase of CALCRIM No. 1193 unconstitutionally tips the balance in favor of the prosecution. Specifically, he contends that in this case the instruction misled the jury into believing that it could use the

CSAAS testimony to bolster the Does' credibility, thereby lessening the prosecution's burden of proof and violating his constitutional due process and jury trial rights. We disagree.

As explained in *Gonzales*, cited above, there is no conflict in the CALCRIM No. 1193 instruction in general, as it accurately informs the jury of the limited use of CSAAS evidence. Moreover, there is little likelihood that the jury here misunderstood its limited parameters given Dr. Carmichael's repeated testimony that he knew nothing about the present case and that nothing (including CSAAS) can determine whether a particular victim has been molested. Further, a modified version of CALCRIM No. 1193 was read to the jury three times during the trial. The instruction expressly stated that CSAAS "is not evidence that the defendant committed any of the crimes charged against him" and specifically instructed the jury that they "may consider this evidence only in deciding whether or not Jane Doe [One] and Jane Doe [Two]'s conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of their testimony." It is presumed that jurors will understand and follow the instructions given by the court. (*People v. Holt* (1997) 15 Cal.4th 619, 662.) There is nothing in this record that suggests otherwise.

Thus, when considering the specific language of CALCRIM No. 1193 in the context of the trial record, it is not reasonably likely that the jury in this case applied it in an impermissible manner. In short, we see no error.

## D. *Cruel and Unusual Punishment*

Cereda next argues that the trial court's sentence of 690 years to life constitutes cruel and unusual punishment under the Eighth Amendment of the United States Constitution and article I, section 17 of the California Constitution. Specifically, Cereda asserts that the sentence—which is

impossible to complete in his lifetime—is not justified by the nature of the conduct, past misconduct, harm to the victims, or danger to the public. While the sentence in this case is severe, we are not persuaded it is unconstitutional.

### 1. *Legal Framework and Standard of Review*

"California's prohibition on 'cruel or unusual punishment' (Cal. Const., art. 1, § 17) has been read to bar any sentence ' "so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." ' " (*People v. Brewer* (2021) 65 Cal.App.5th 199, 213 (*Brewer*).)[9] "Whether a particular punishment is disproportionate to the offense is, of course, a question of degree. The choice of fitting and proper penalties is not an exact science, but a legislative skill involving an appraisal of the evils to be corrected, the weighing of practical alternatives, consideration of relevant policy factors, and responsiveness to the public will; in appropriate cases, some leeway for experimentation may also be permissible. The judiciary, accordingly, should not interfere in this process unless a statute prescribes a penalty 'out of all proportion to the offense' [citations], i.e., so severe in relation to the crime as to violate the prohibition against cruel or unusual punishment." (*In re Lynch* (1972) 8 Cal.3d 410, 423–424 (*Lynch*), superseded by statute on other grounds as explained in *In re Palmer* (2021) 10 Cal.5th 959, 974–975.)

"California courts examine three criteria in assessing disproportionality: (1) the nature of the offense and offender, with emphasis on [his or her] danger to society; (2) the penalty imposed compared with the

---

[9] Since the federal Constitution affords no greater protection than the state Constitution, we will analyze Cereda's claim under California law. (See *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1510.)

35

penalties for more serious crimes in California; and (3) the punishment for the same offense in other jurisdictions."[10] (*Brewer*, *supra*, 65 Cal.App.5th at pp. 213–214; accord, *Lynch*, *supra*, 8 Cal.3d at pp. 425–427.) "In examining the nature of the offense, we ' "look at the totality of the circumstances, including motive, the way the crime was committed, the extent of the defendant's involvement, and the consequences of defendant's acts." ' [Citation.] In examining the nature of the offender, we consider ' "whether 'the punishment is grossly disproportionate to the defendant's individual culpability as shown by such factors as his age, prior criminality, personal characteristics, and state of mind.' " ' " (*People v. Gomez* (2018) 30 Cal.App.5th 493, 500.)

" 'Whether a punishment is cruel or unusual is a question of law for the appellate court, but the underlying disputed facts must be viewed in the light most favorable to the judgment.' " (*People v. Mantanez* (2002) 98 Cal.App.4th 354, 358.)

### 2. *Sentence not Cruel and Unusual Punishment*

The sentence in this case is no doubt long. On the other side of the scale, however, the sheer number of Cereda's multiple sex offenses—committed against two young, vulnerable victims over whom he occupied a position of authority and trust—weighs heavily against him. Indeed, Jane Doe One's testimony at trial made clear that the incidents which formed the basis for the myriad charges against him were an exceedingly small portion of the totality of what occurred. Further, the manner in which Cereda committed the offenses—through a web of isolation and psychological coercion—evinced a high degree of cruelty and callousness. And as we

---

[10] Cereda makes no argument under this third criterion, so our opinion will focus on the other two.

discuss below, the consequences to both girls and their mother were significant and ongoing.  We see nothing in Cereda's personal characteristics that changes this calculus.  Cereda, the sole culpable party, was an adult when the crimes were committed.  He expressed no remorse for his repeated acts of molestation, instead dragging the family through an extended court process where he essentially called Jane Doe One a liar.  And, while Cereda points to the probation officer's assessment that he has a below average risk of reoffending, this single favorable factor does not outweigh the other factors.  (Compare *People v. Baker* (2018) 20 Cal.App.5th 711, 725.)

Cereda acknowledges that other appellate courts have upheld de facto sentences of life without the possibility of parole (LWOP) for multiple sex offenses against a claim of cruel and unusual punishment.  Nevertheless, he contends that the penalty imposed here is disproportionate because it shocks the conscience and serves no rational Legislative purpose.  Implicit in Cereda's argument is the assumption that the multiple acts of sexual molestation of which he was convicted are less serious than a single murder conviction subject to an LWOP sentence.  However, "[t]he penalties for single offenses . . . cannot properly be compared to those for multiple offenses." (*People v. Crooks* (1997) 55 Cal.App.4th 797, 807.)  Rather, "[r]ecidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer sentences for subsequent offenses."  (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823–824.)  Among the primary goals of recidivist statutes are "to deter repeat offenders and, at some point in the life of one who repeatedly commits criminal offenses serious enough to be punished as felonies, to segregate that person from the rest of society for an extended period of time."  (*Id.* at p. 824.)  As the United States Supreme Court has stated: "[W]e have repeatedly upheld recidivism statutes 'against contentions

that they violate constitutional strictures dealing with . . . cruel and unusual punishment.' " (*Parke v. Raley* (1992) 506 U.S. 20, 27.)  That Cereda was convicted of all of the offenses at the same time is irrelevant to the purposes underlying recidivist concerns, as the timing of the discovery of the multiple acts, and of the prosecutions and convictions, was pure happenstance.

Finally, "[t]here exists a strong public policy to protect children of tender years." (*People v. Olson* (1984) 36 Cal.3d 638, 646.)  "[L]ewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable." (*People v. Christensen* (2014) 229 Cal.App.4th 781, 806.)  Sexual offenses against minors "may have lifelong consequences to the well-being of the child." (*Ibid*.)  Thus, the One Strike Law reflects the Legislature's "intolerance toward child sexual abuse." (*People v. Wutzke* (2002) 28 Cal.4th 923, 931.)  Indeed, "persons convicted of sex crimes against multiple victims within the meaning of section 667.61, subdivision [(e)(4)] 'are among the most dangerous' from a legislative standpoint." (*Id*. at pp. 930-931.)  Consequently, "[t]he One Strike scheme . . . contemplates a separate life term for each victim attacked on each separate occasion." (*Id*. at p. 931.)

Given these considerations, numerous courts have upheld sentences in multiple child molestation cases that exceed the lifetime of the defendant and thus amount to an LWOP sentence.  (See, e.g., *People v. Retanan* (2007) 154 Cal.App.4th 1219, 1222, 1231 [upholding sentence of 135 years to life for 16 felony offenses arising from the molestation of four children]; *People v. Bestelmeyer* (1985) 166 Cal.App.3d 520, 532 [affirming 129 year sentence for 25 counts of sexual assault on his stepdaughter]; compare *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1310 [195 years to life for seven counts of forcible oral copulation and seven counts of forcible rape against five adult victims]; *People v. Cartwright* (1995) 39 Cal.App.4th 1123, 1130, 1134–1137

[affirming sentence of 375 years to life plus 53 years based on third strike conviction for 19 felonies involving the violent sexual assault of three women].) As stated above, we should not interfere with the Legislature's choice of fitting and proper penalties "unless a statute prescribes a penalty 'out of all proportion to the offense.' " (*Lynch*, *supra*, 8 Cal.3d at pp. 423–424.) We see nothing in Cereda's extended and extensive sexual victimization of his two young stepdaughters which causes us to second guess the proportionality of the Legislature's penalty determination. (See *People v. Byrd* (2001) 89 Cal.App.4th 1373, 1375–1376, 1383 [determinate sentence of 115 years, plus an indeterminate sentence of 444 to life for 12 counts of robbery, mayhem, attempted murder, and possession of a firearm by a felon does not constitute cruel and unusual punishment; sentence "serves valid penological purposes: it unmistakably reflects society's condemnation of defendant's conduct and it provides a strong psychological deterrent to those who would consider engaging in that sort of conduct in the future"].)

## E. *Noneconomic Restitution*

Cereda finally argues that the noneconomic damages awarded in this case must be stricken as unauthorized. First, he asserts that he was entitled under the state and federal constitutions to a jury trial on the amount of any such damage award. Second, he maintains that the awards of noneconomic damages to each of the three victims in this case must be stricken because there was insufficient evidence in the record that any of them suffered psychological harm. We address and reject each contention in turn.

### 1. *Legal Framework and Standard of Review*

"Pursuant to the California Constitution, victims of crime have a right to restitution from criminal defendants: 'Restitution shall be ordered from the convicted wrongdoer in every case, regardless of the sentence or

39

disposition imposed, in which a crime victim suffers a loss.' (Cal. Const., art. I, § 28, subd. (b)(13)(B).) To [implement] this constitutional requirement, the Legislature enacted section 1202.4, which requires the trial court to order a defendant to pay victim restitution 'in an amount established by court order, based on the amount of loss claimed by the victim . . . or any other showing to the court.' (§ 1202.4, subd. (f).)" (*People v. Lehman* (2016) 247 Cal.App.4th 795, 800 (*Lehman*).)

"With one exception, restitution orders are limited to the victim's economic damages." (*People v. Smith* (2011) 198 Cal.App.4th 415, 431 (*Smith*).) The exception provides that restitution may be ordered for "[n]oneconomic losses, including, but not limited to, psychological harm, for felony violations of Section 288, 288.5, or 288.7." (§ 1202.4, subd. (f)(3)(F).) "Noneconomic damages are 'subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation.' (Civ. Code, § 1431.2, subd. (b)(2).)" (*Smith*, at p. 431.)

In *Apprendi v. New Jersey* (2000) 530 U.S. 466 (*Apprendi*), the United States Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." (*Id.* at p. 490.) "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (*Blakely v. Washington* (2004) 542 U.S. 296, 303, italics omitted.) The principle of *Apprendi* applies to criminal fines. (*Southern Union Company v. United*

*States* (2012) 567 U.S. 343, 346 [fines for violating federal environmental statutes].)

In the context of economic restitution awarded pursuant to section 1202.4, numerous appellate courts have concluded that there is no Sixth Amendment right to a jury trial under *Apprendi* and its progeny because direct victim restitution is not a criminal penalty. (*People v. Pangan* (2013) 213 Cal.App.4th 574, 585 (*Pangan*), citing *U.S. v. Behrman* (7th Cir. 2000) 235 F.3d 1049, 1054 ["[D]irect victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits. It is not increased 'punishment.' "]; *People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1183–1184 (*Chappelone*) [rejecting argument that victim restitution under section 1202.4 is increased punishment for a crime; instead, " ' "the primary purpose of victim restitution is to provide monetary compensation to an individual injured by crime" ' "]; accord, *People v. Millard* (2009) 175 Cal.App.4th 7, 35–36 (*Millard*); see also § 1202.4, subd. (a)(3)(B) [a victim restitution award "shall be enforceable as if the order were a civil judgment"].)

In *Smith*, *supra*, 198 Cal.App.4th 415, the Third District concluded by analogy that there is no constitutional right to a jury trial with respect to a restitution order for *noneconomic* damages awarded pursuant to section 1202.4. (*Smith*, at p. 433.) Specifically, *Smith* reasoned: "[T]here is no basis for distinguishing jury trial rights, or lack thereof, for restitution orders for economic damages and restitution orders for noneconomic damages. In both cases, the trial court is performing a task that, in a civil case, a jury would perform." (*Ibid.*)

" ' "A restitution order is reviewed for abuse of discretion and will not be reversed unless it is arbitrary or capricious. [Citation.] No abuse of

41

discretion will be found where there is a rational and factual basis for the amount of restitution ordered." ' [Citation.] 'The court "must demonstrate a rational basis for its award[] and ensure that the record is sufficient to permit meaningful review. The burden is on the party seeking restitution to provide an adequate factual basis for the claim." ' " (*People v. Gomez* (2023) 97 Cal.App.5th 111, 116 (*Gomez*); accord, *People v. Giordano* (2007) 42 Cal.4th 644, 655.) "However, a restitution order 'resting upon a " 'demonstrable error of law' " constitutes an abuse of the court's discretion.' " (*Millard, supra,* 175 Cal.App.4th at p. 26.)

### 2. *No Right to a Jury Trial on Noneconomic Restitution*

As mentioned above, the trial court here awarded noneconomic restitution of $750,000 to Jane Doe One, $25,000 to Jane Doe Two, and $50,000 to R.M., the mother of the Does. (See § 1202.4, subdivision (f)(3)(F).) Cereda contends these awards were improper because he was entitled to a jury trial to determine the amount of any noneconomic losses based on proof beyond a reasonable doubt.[11] Acknowledging the case law to the contrary set forth above, Cereda maintains that *Smith* was wrongly decided. And he attempts to distinguish the other cases by arguing they involved economic rather than noneconomic restitution. Cereda then asserts a laundry list of reasons why noneconomic restitution should be treated differently than economic restitution with respect to jury trial rights, none of which we find persuasive.

---

[11] The Attorney General argues in passing that Cereda has forfeited this claim by failing to request a jury trial with respect to restitution in the trial court. We are skeptical that, should a constitutional jury trial right exist in this context, it would be subject to forfeiture. However, as we conclude that no such right exists, we do not reach the issue.

To begin with, we disagree with Cereda's general premise—that noneconomic restitution constitutes increased punishment, while economic restitution does not. Both are forms of direct victim restitution under section 1202.4, the primary purpose of which " ' "is to provide monetary compensation to an individual injured by crime" ' " (*Chappelone, supra,* 183 Cal.App.4th at p. 1184; see *Pangan, supra,* 213 Cal.App.4th at p. 585 ["[D]irect victim restitution is a substitute for a civil remedy so that victims of crime do not need to file separate civil suits.].) Moreover, "[t]o the extent a victim restitution order has the secondary purposes of rehabilitation of a defendant and/or deterrence of the defendant and others from committing future crimes, those purposes do not constitute increased punishment of the defendant." (*Millard, supra,* 175 Cal.App.4th at pp. 35–36.)

Cereda nevertheless argues that noneconomic restitution must be viewed as primarily punitive because subdivision (f)(3)(F) of section 1202.4— the provision authorizing noneconomic restitution—applies only to defendants convicted of certain sexual offenses against children, singling them out for disparate treatment. To the contrary, the legislative history underlying the adoption of this provision reflects an entirely nonpunitive purpose. In 1991, the Supreme Court held that insurers under general liability policies "are not required to indemnify their insureds for damages caused by an insured's sexual molestation of a child." (*J.C. Penny Casualty Ins. Co. v. M.K.* (1991) 52 Cal.3d 1009, 1014 (*J.C. Penny*).) The case dealt specifically with a felony conviction under section 288 and "foreclosed the use of liability insurance proceeds as compensation" for victims of such abuse. (*People v. Montiel* (2019) 35 Cal.App.5th 312, 333 (dis. opn. of Banke, J.).) The Legislature responded by adopting legislation focused "on providing the minor child victims of molesters with additional sources of compensation.

43

The Senate Committee on Judiciary report explained: 'In lieu of making insurance benefits available to victims of an insured's criminal conduct, proponents instead propose several other ideas to compensate *the victim* for the injuries.' [Citation.] These were: (1) '[i]nvading the homestead exemption of the defendant'; (2) '[i]ncreasing State assistance to *child victims* of sexual abuse'; and (3) '[i]ncreasing restitution payments to the *child molestation victim* to also cover psychological damages and noneconomic losses.'" (*Id.* at pp. 333–334, some italics added.) In other words, the Legislature was not trying to punish child sex offenders when it created a substitute for a civil remedy so that these particular victims of crime need not file separate civil suits.

Cereda additionally contends that noneconomic restitution is punitive because the amount of restitution 'necessarily' turns on factors such as the duration or severity of the crime. Cereda provides no authority for the proposition that a restitution award based on such factors is necessarily punitive. To the contrary, to the extent the duration and severity of the crime corroborate a victim's claim of psychological harm or other noneconomic losses, their consideration fully comports with the compensatory nature of the award.

Cereda also complains there is "literally no limit" to the amount of noneconomic restitution a trial court may impose. It is no doubt true that the task of translating nonpecuniary injuries into dollars and cents is "difficult" and "not a process of measurement." (*Beagle v. Vasold* (1966) 65 Cal.2d 166, 172.) But the subjective nature of this determination does not change the compensatory nature of noneconomic restitution. (See *Corenbaum v. Lampkin* (2013) 215 Cal.App.4th 1308, 1332 [noneconomic damages "compensate" injured plaintiff for nonpecuniary injuries such as pain and

suffering].)  Nor does it mean that noneconomic restitution does not compensate a victim for his or her actual loss.  And it is simply incorrect to say there is no limiting principle to awards of noneconomic restitution.  As stated above, case law cautions that a court must have a rational and factual basis for the restitution ordered and it may not be arbitrary or capricious.  (*Gomez*, *supra*, 97 Cal.App.5th at p. 116.)

Finally, citing *People v. Dueñas* (2019) 30 Cal.App.5th 1157 (*Dueñas*), Cereda contends that the noneconomic restitution award is punitive because he does not have the ability to pay it.  However, *Dueñas* is of no assistance to Cereda.  There, the court held that an indigent defendant has a due process right to a determination of ability to pay before the imposition of court operations assessments (§ 1465.8) and court facilities assessments (Gov. Code, § 70373) and the execution of restitution fines (§ 1202.4, subd. (b)).  (*Dueñas*, at pp. 1164, 1169.)  *Dueñas* expressly did not address direct victim restitution (*id*. at pp. 1169-1170), and several courts have since held that the *Dueñas* rule does not apply to victim restitution (see, e.g., *People v. Pack-Ramirez* (2020) 56 Cal.App.5th 851, 860; *People v. Abrahamian* (2020) 45 Cal.App.5th 314, 338; *People v. Evans* (2019) 39 Cal.App.5th 771, 776–777).  Thus, *Dueñas* does not suggest that noneconomic victim restitution constitutes increased punishment for purposes of *Apprendi* simply because a defendant does not have the ability to pay it.

In sum, none of Cereda's myriad arguments convince us that a jury trial is constitutionally required in this context.

### 3.    *Restitution Awards Adequately Supported by the Record*

Cereda next challenges the awards of noneconomic restitution to Jane Doe One, Jane Doe Two, and R.M. as not supported by the record.

Specifically, he asserts there is no evidence in the record that any of these individuals suffered psychological harm. We disagree.[12]

Section 1202.4 requires the trial court to order a defendant to pay victim restitution "in an amount established by court order, based on the amount of loss claimed by the victim . . . or *any other showing to the court*." (§ 1202.4, subd. (f), italics added.) Thus, the statute "does not require any particular kind of proof to establish a victim's losses." (*Lehman, supra*, 247 Cal.App.4th at p. 803.) Specifically, a court may consider the trial testimony of the victims, statements made at the sentencing hearing, and the contents of the probation report. (*Id.* at pp. 801, 803.) As stated above, noneconomic damages are "subjective, non-monetary losses including, but not limited to, pain, suffering, inconvenience, mental suffering, emotional distress, loss of society and companionship, loss of consortium, injury to reputation and humiliation." (Civ. Code, § 1431.2, subd. (b)(2).) Thus, the question before us is whether the record provides substantial evidence that Jane Doe One, Jane Doe Two, and R.M. suffered psychological harm and/or other noneconomic losses.

---

[12] *Smith* and *Lehman* have applied the standard of review from the civil damages context in reviewing the *amount* of a restitution award for noneconomic damages under section 1202.4, holding: " 'An appellate court can interfere on the ground that the judgment is excessive only on the ground that the verdict is so large that, at first blush, it shocks the conscience and suggests passion, prejudice or corruption on the part of the jury.' " (*Smith, supra*, 198 Cal.App.4th at p. 436; accord, *Lehman, supra*, 247 Cal.App.4th at p. 801.) Cereda argues vociferously that this standard for reviewing civil judgments should not apply in the context of criminal restitution orders. However, because Cereda's challenge is not that the award is excessive, but rather that it lacks an adequate factual basis, the shocks-the-conscience standard is inapplicable here. (See *Gomez, supra*, 97 Cal.App.5th at p. 116, fn. 4.) Rather, we will apply the traditional abuse of discretion standard.

Preliminarily, we agree with Cereda that some evidence of harm to these specific victims must be present in the record to justify an award for noneconomic damages. It is no doubt true that the nature of egregious crimes such as Cereda's renders it *very likely* that his victims were psychologically harmed. (See *People v. Martinez* (2017) 8 Cal.App.5th 298, 305 [" 'It is well recognized that " 'child sexual abuse results in long-term emotional and psychological damage to the child victim if left untreated.' " ' "].) However, as our colleagues in Division Five of this District recently explained: " '[A] crime victim may recover only for losses *personally incurred by that victim.*' (*People v. Runyan* (2012) 54 Cal.4th 849, 859; see also Cal. Const., art. I, § 28, subd. (b)(13)(A) ['all persons who suffer losses as a result of criminal activity shall have the right to seek and secure restitution from the persons convicted of the crimes causing *the losses they suffer,*' (italics added)].) In other words, it is insufficient that the average victim would suffer injury from a particular type of crime, or that *generally* victims of such crimes suffer injury." (*Gomez, supra,* 97 Cal.App.5th at p. 118.)

Here, we cannot conclude the trial court abused its discretion in finding that all three victims had suffered non-monetary losses. First, as stated above, it is very likely that such harm did occur. (See *J.C. Penny, supra,* 52 Cal.3d at p. 1026 ["Some acts are so inherently harmful that the intent to commit the act and the intent to harm are one and the same. The act is the harm. Child molestation is not the kind of act that results in emotional and psychological harm only occasionally."] Second, in awarding noneconomic damages in this case, the trial court was clear that it was basing its decision on the specific facts before it, stating that "the numbers [were]. . . reflective of the deep and enduring pain that Mr. Cereda inflicted on the victims."

47

Presumably, then, the court based its decision on the testimony it had heard at trial, the probation report, and statements presented at sentencing.

R.M. provided the following statement to the trial court at sentencing: "[Cereda], you have ruined our lives and I am ready to put this and you behind us. We will somehow move on past the chaos you created. You are an ugly and evil human being and still have not taken responsibility for what you have done. You lied, you lied on the stand, you lied to us, you have lied to everyone. The worst part is that we haven't been able to begin healing because you have drug us through the mud to protect your lies. Do you even know what the truth is anymore?? You know what, though, we will win this battle, and one day very soon you won't even be a memory. [¶] Judge, [¶] Please allow [Cereda] to enjoy a long and tortured life in prison with no chance of parole. I want [Cereda] to suffer each day realizing all the pain his lies created. Please grant me and my children the 10-year criminal restraining order so that we don't have to keep reopening our wounds." R.M. also reported to the probation officer that both Jane Doe One and Jane Doe Two had endured emotional injuries from Cereda's conduct and that Jane Doe One had sought mental health treatment. And she disclosed that Cereda's conduct had caused her family to relocate, leaving behind their family, friends, and their support system.

These facts, along with R.M.'s testimony at trial, provide more than substantial evidence that she suffered psychological harm/noneconomic losses as a result of Cereda's criminal activity. R.M. stated that she had known Cereda since she was 16 and did not think such abuse was something he could ever do. When the police told her about Cereda's molestation of Jane Doe One and that there was an audio recording, she was "shocked" and felt "numb." When she testified about conducting the pretext call, the prosecutor

48

had to stop questioning her at one point to ask if she was okay.  R.M. stated it was a very upsetting call to make.  She also reported that she had been told not to talk to her daughters about the abuse while the criminal trial was pending, so they had been unable to heal through talking with each other.  She felt "[a]wful" for having put her daughters in a situation where they were abused.  She did not have any contact with Cereda after the day of the pretext call and did not intend to contact him in the future.  She divorced him in 2020 after 11 years of marriage.  On cross-examination, R.M. admitted she could not refresh her recollection about Jane Doe One's initial disclosure to her because, even though she could read her police interview and recalled the conversation she had about it, it was "not something [her] brain [was] letting [her] remember right now."  She went on:  "You know it's called therapy that I have to deal with."  On re-direct, R.M. stated she felt "[l]ike a fool" for putting her trust in Cereda over Jane Doe One during the initial disclosure.

With respect to Jane Doe Two, the jury convicted Cereda of—and Cereda admitted to—significant sexual abuse she could not recall enduring.  According to the probation report, after Jane Does One and Two were initially interviewed separately regarding Cereda's sexual abuse, the two were left in the interview room together.  Jane Doe Two told her sister that she did not remember being abused by Cereda, but she might have blocked it out.  She told both the probation officer and her mother that she believed she might have repressed memories.  At trial, Jane Doe Two testified that she had very few memories from when she was younger.  In addition, as a result of the abuse on Jane Doe One, she was "heart broken" and separated from her family, with R.M., Jane Doe One, and her two half-brothers moving out of state, while she remained in Napa with her grandparents where she had made a life for herself.  While there is no evidence that Jane Doe Two had yet

49

engaged in therapy, it is reasonable to infer on this record that she suffered psychological harm—i.e., that she was so traumatized by the sexual abuse that she had repressed it and that, as R.M. reported, she was currently suffering pain, loss of companionship, and her life was "ruined" as a result of Cereda's crimes. Not only was she unable to protect her sister from similar abuse, but her entire family was torn apart as a result.

As stated above, R.M. similarly reported that Jane Doe One was suffering pain as a result of Cereda's abuse and continued lies, that her life had been "ruined," and that she had already begun therapy. Jane Doe One testified at length at trial regarding the extensive abuse she suffered as a young child at the hands of the man she considered her father. During that testimony, the prosecutor repeatedly asked her if she was okay. Even defense counsel acknowledged to Jane Doe One that she was "kind of having a hard time" testifying. And Jane Doe One, herself, also needed to ask for a break at one point. It is reasonable to infer that the trial court observed Jane Doe One's emotional distress throughout her testimony. These facts, as well as the duration and severity of the abuse and the psychological duress described above that Cereda used to control Jane Doe One, provide substantial evidence supporting her award of noneconomic damages.

### III. DISPOSITION

The judgment is affirmed.

                                        LANGHORNE WILSON, J.


WE CONCUR:


BANKE, ACTING P.J.


CASTRO, J.[*]


A164330

---

[*] Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.